# EXHIBIT B

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS



Schlemmer #1
DEPOSITION EXHIBIT
4/26/01

| | |
|---|---|
| LIBERTY MUTUAL INSURANCE COMPANY, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>THE BLACK & DECKER CORPORATION, BLACK & DECKER INC., BLACK & DECKER (U.S.) INC., EMHART CORPORATION, and EMHART INDUSTRIES, INC., )<br>)<br>Defendants. ) | C.A. No. 96-10804-DPW |

## AFFIDAVIT OF ALAN SCHLEMMER

I, Alan Schlemmer, do depose and say as follows:

1. I am Unit Director in what is commonly referred to as the Miscellaneous Toxic Tort Group, in the Environmental Department at Liberty Mutual Insurance Company ("Liberty Mutual"). In that capacity, I am familiar with the factual circumstances surrounding the three claims at issue in the above-captioned actions, which are commonly referred to as the "Arkansas Hearing Loss Claim," the "Mississippi Hearing Loss Claim," and the "Mississippi Hand/Arm Vibration Claim."

**Arkansas Hearing Loss Claim**

2. It is my understanding that the Arkansas Hearing Loss Claim arises out of a complaint filed in Arkansas state court by more than 400 current or former employees of the Texarkana, Arkansas plant of Copper Tire Company. The underlying plaintiffs claimed that they suffered hearing loss as a result of exposure to products utilized by the

workers in the Cooper Tire plant, including products allegedly manufactured by the Farrel Company ("Farrel"). Inasmuch as the Cooper Tire plant first opened in 1964, that date was determined by the underlying parties to be the earliest possible date of exposure to any Farrel products by the workers.

3. The underlying plaintiffs' complaint was initially dismissed and then refiled in the Arkansas state court. It is my understanding that approximately one third of the claims asserted against Farrel were dismissed from the state court action in 1994, with the remaining claims being dismissed in 1996. It is also my understanding that no damage amounts have been paid to the underlying plaintiffs on behalf of Farrel as a result of the dismissal.

4. The Black & Decker Corporation, or an affiliated company, ("Black & Decker") made an initial demand for insurance coverage upon Liberty Mutual for the defense and indemnification of Farrel with respect to the underlying action in the Arkansas Hearing Loss Claim under policies of insurance issued to the USM Corporation ("USM"). Black & Decker maintained that it was the successor in interest to the USM policies, and that Farrel was a "named insured" under those same policies.

5. In response to Black & Decker's demand for coverage under the USM policies with respect to Farrel's alleged liability in the Arkansas Hearing Loss Claim, Liberty Mutual agreed to provide a defense solely in conjunction with Black & Decker's other insurance carriers. Black & Decker specifically agreed to this arrangement, and to the creation of a cost-sharing agreement to be entered into amongst Black & Decker and its insurance carriers.

6. Pursuant to this arrangement, Liberty Mutual and Black & Decker's other carriers entered into a cost-sharing agreement with respect to the defense obligations incurred in the Arkansas Hearing Loss Claim, with each insurer paying in proportion to the percentage of the exposure period for which it provided coverage to Farrel." The particulars of the cost-sharing agreement is set forth in a letter dated July 30, 1992, from Delores Ladd, a Senior Regional Analyst, Southeastern Environmental Claim Office, of the Aetna Casualty & Surety Company, as is attached hereto as Exhibit A. The letter outlined the cost-sharing agreement which had been entered into amongst the various carriers, and Black & Decker, beginning with the alleged first "exposure" time period beginning on June 1, 1964 and running through January 1, 1991.

7. Pursuant to this cost-sharing agreement, Black & Decker's carriers each assumed a percentage of the defense costs being incurred in defense of Farrel with respect to the Arkansas Hearing Loss Claim. Pursuant to the terms of the agreement, Liberty Mutual was assigned a time period from December 31, 1968 through May 4, 1976, representing its coverage under various USM policies. This worked out to be 27% of the total time period. The period between June 1964 and December 31, 1968, was initially assigned to "unidentified" carriers. This period of time amounted to 17% of the total amount of time for cost-sharing purposes.

8. My review of the pertinent files indicates that on March 15, 1993, Delores Ladd wrote a letter to Shirlann Shifflett, a Claims Administrator at Black & Decker, concerning the Arkansas Hearing Loss Claim and the cost-sharing agreement. In that letter, attached hereto as Exhibit B, Ms. Ladd described her discussions with Stephen

3

Johnson, a Technical Claims Specilist at Liberty Mutual, concerning Liberty Mutual's appropriate share of the defense costs under the cost-sharing agreement.

9. As a result of information received from Liberty Mutual concerning coverage under the various USM policies, Ms. Ladd set forth new percentages under the cost-sharing agreement which enlarged the period for "undocumented" to include the period from June 1, 1964 through November 1, 1971, reflecting a percentage of 27%. Liberty Mutual's share was thereupon reduced from 27% to 17%. At this point in time, Black & Decker had only made claims against Liberty Mutual with respect to the Arkansas Hearing Loss Claim under USM policies.

10. In a memorandum from Stephen Johnson to me, dated April 15, 1993, attached hereto as Exhibit C, Mr. Johnson set forth the reasoning involved in the reduction of Liberty Mutual's cost-sharing arrangement percentage from 27% to 17%. In his memorandum to me, Mr. Johnson indicated that he had spoken to Delores Ladd at Aetna, and that she indicated to him that Black & Decker had agreed to pay 27% of the defense costs pursuant to the cost-sharing agreement and that Liberty Mutual's agreed upon share would be 17%.

11. At a subsequent point in time, we learned from Black & Decker that it was also seeking coverage from Liberty Mutual pursuant to various policies issued by Liberty Mutual directly to Farrel. Thereafter, inquiries took place at Liberty Mutual in an attempt to determine what coverages might be available under policies issued to Farrel.

12. By the fall of 1994, under the cost-sharing agreement, Black & Decker had been allocated a 27% share of the defense costs for the period June 1, 1964 through November 1, 1971, when no insurance coverage of Farrel could be located. Black &

4

Decker then maintained that it had subsequently determined that, in fact, Liberty Mutual had provided coverage to Farrel during this time period and that Liberty Mutual was responsible for Black & Decker's 27% allocated share of all defense costs associated with the Arkansas Hearing Loss Claim.

13. In December 1994, Liberty Mutual had completed its search for any and all comprehensive general liability policies issued to Farrel. Liberty Mutual was able to then locate only primary insurance policies issued by Liberty Mutual in effect after July 1, 1967. Liberty Mutual was unable to locate or confirm the existence of any insurance policies issued to Farrel in existence from July 1, 1964 through July 1, 1967. As such, Liberty Mutual agreed to assume a portion of that "undocumented" percentage of defense costs pursuant to the cost-sharing agreement, which had been previously assigned to Black & Decker, so that Liberty Mutual total share would reflect the time period of coverage effective from July 1, 1967 through May 5, 1976.

14. This amounted to an increase for Liberty Mutual up to 33% of the total allocation of defense costs pursuant to the cost-sharing agreement. Because Liberty Mutual was unable to find sufficient evidence of the terms, limits and conditions of any alleged liability coverage issued to Farrel in existence from 1964 through July 1, 1967, therefore, Liberty Mutual could not agree to accept Black & Decker's assigned portion of defense costs for that time period.

15. Subsequent to the filing of the above-captioned action, Liberty Mutual located comprehensive general liability insurance policies issued to Farrel by Liberty Mutual for the time period 1964 through July 1, 1967. As a result, Liberty Mutual has

agreed to pay for those additional defense costs alleged incurred by Black & Decker with respect to the time periods from 1964 to 1967.

16.  Liberty Mutual has paid to Black & Decker all of its share of defense costs pursuant to the cost-sharing agreement in the Arkansas Hearing Loss Claim, except with respect to the three-year time period from 1964 to 1967 as set forth above. In fact, Liberty Mutual has been making payments directly to Black & Decker's counsel in the underlying action up through the last invoices received and paid in 1997. In this regard, Liberty Mutual had paid out $155,754.17 in defense and related costs pursuant to the cost-sharing agreement as to the Arkansas Hearing Loss Claim.

17. Black & Decker has never made a request to Liberty Mutual for reimbursement of any defense costs which it paid directly to underlying counsel with respect to the three-year period 1964 to 1967 since 1995. To the extent that Black & Decker will provide Liberty Mutual with evidence of payment of these additional defense costs which it purports to have paid out with respect to the allocated time period from 1964 through 1967, Liberty Mutual is ready to review those invoices and bills and tender the appropriate payment.

**Mississippi Hearing Loss Claim**

18.  It is my understanding that the Mississippi Hearing Loss Claim involved some 3,500 complaints by present and former employees of the Ingalls Shipyard in Pascagoula, Mississippi, filed in Mississippi state court. In their complaints, to which are identical except for the dates of the alleged exposure and the name of the plaintiffs, it was alleged that the various underlying plaintiffs suffered hearing loss from the use of power tools manufactured by a variety of companies including Black & Decker. The underlying

complaints were filed against Black & Decker in July 1991, and all claims against Black & Decker were dismissed as of August 1, 1996. Black & Decker has stated that it paid out no damage amounts with respect to this claim.

19. In a letter dated August 6, 1991, Liberty Mutual was invited by Black & Decker to participate with its other insurance carriers in the defense of its potential liability with respect to the underlying complaints in the Mississippi Hearing Loss Claim. Liberty Mutual subsequently agreed to participate in joint defense of this matter along with other insurance carriers and Back & Decker.

20. Liberty Mutual has made substantial payments for defense costs incurred with respect to this claim, pursuant to a "cost-sharing agreement, in the amount of $158,214.04. The cost-sharing agreement was memorialized in a document, a copy of which is attached as Exhibit D. Pursuant to the terms of that cost-sharing agreement, Liberty Mutual was assigned a 37.5% share of the total defense costs incurred with respect to the Mississippi Hearing Loss Claim. Pursuant to that same agreement, Black & Decker agreed to assume 33.5% of the total incurred defense costs.

21. In a letter from Linda McCroddan, a Senior Claim Representative at ESIS, Inc. ("ESIS") addressed to me and other insurance carriers' representatives, dated November 15, 1991, Ms. McCroddan identified ESIS as a company that had been retained to provide claims handling services to Black & Decker, and ESIS would be coordinating the defense of the Mississippi Hearing Loss Claim on behalf of Black & Decker. A copy of the Letter from Linda McCroddan, dated November 15, 1991, is attached as Exhibit E.

22. On January 31, 1992, Ms. McCroddan on behalf of Black & Decker sent a letter to Black & Decker's various insurance carriers, including Liberty Mutual, concerning the Mississippi Hearing Loss Claim litigation. With that letter, Ms. McCroddan enclosed her draft of the memorialization of the cost-sharing agreement to be entered into among all the parties, including Black & Decker. In that initial draft of the cost-sharing agreement, Black & Decker was identified as a party to the agreement and its share of defense costs was set to be 20%. The initial draft of that agreement is attached to Ms. McCroddan's January 31, 1992 Letter and both documents are set forth as Exhibit F. The remaining carriers, including Liberty Mutual, each was assigned a 20% obligation for paying defense costs. In her letter, Ms. McCroddan requested that the parties get back to her with any proposed modifications to the agreement.

23. Subsequently, Liberty Mutual was invited to attend a meeting held in Philadelphia to discuss the cost-sharing arrangement and a coordinated defense strategy. The meeting was coordinated by Ms. McCroddan of ESIS. At the meeting were several representatives of Black & Decker's other carriers, including the Home and Hartford, and myself on behalf of Liberty Mutual. Also present were an attorney from the law firm Mendes & Mount, on behalf of the London Insurers, Richard Kidwell, an attorney from Miles & Stockbridge, Black & Decker's counsel, and also the risk manager for Black & Decker. Discussions were had during the meeting concerning the terms of the cost-sharing agreement, and all parties, including Black & Decker, agreed that the defense costs incurred in defense of the Mississippi Hearing Loss Claim would be paid out pursuant to the terms of the agreement, and according to the percentages assigned to each party.

24.     At that time, Liberty Mutual was only able to confirm the existence, terms and conditions of insurance policies issued to Black & Decker for the time period 1970 through 1979. Black & Decker maintained, however, that Liberty Mutual had provided insurance coverage to Black & Decker beginning as early as 1960. After discussions were had with Richard Kidwell of Miles & Stockbridge, Black & Decker's counsel, it was ultimately agreed that Liberty Mutual would fund 37.5% of the incurred defense costs, and Black & Decker would fund 33.5%. As a settlement concession to Black & Decker, Liberty Mutual accepted the 37.5% share, which was a larger share than Liberty Mutual would have otherwise been required to pay pursuant to the cost-sharing agreement policy period allocation formula.

25.     Subsequent to that time, in her letter dated August 5, 1992, and attached as Exhibit G, Ms. McCroddan sent to me a revised draft of the cost-sharing agreement. She noted in her letter that Black & Decker had agreed to consider itself "self insured" for the period of 1964 through 1970, and as a result, Black & Decker's corresponding percentage share had been increased from 20% to 33.5%. The other shares had also been modified, with Liberty Mutual's share rising from 20% to 37.5%. Attached to her August 5, 1992 letter was a revised interim cost-sharing agreement including the altered percentage shares for defense costs.

26.     On June 18, 1993, in a letter from Ms. McCroddan to various insurance company representatives, including me and attached as Exhibit H, she indicated that ESIS, on behalf of Black & Decker, had made defense costs payments on behalf of the parties to the cost-sharing agreement in an amount totaling $167,644.46. Pursuant to "our cost-sharing agreement," Ms. McCroddan set forth the amount owed by each carrier,

including Liberty Mutual. Liberty Mutual was informed that it owed $62,866.67 pursuant to its 37.5% share under the terms of the cost-sharing agreement.

27. On November 3, 1992, on behalf of Liberty Mutual, I executed the written memorialization of the cost-sharing agreement, a copy of which is attached as Exhibit I.

28. In a letter dated December 28, 1993, from Gordon Clifford, Team Leader, ESIS to John P. Sweeney, Black & Decker's attorney at Miles & Stockbridge, attached as Exhibit J, concerning the Mississippi Hearing Loss Claim, Mr. Clifford indicated that he was enclosing a copy of "the Cost-Sharing Agreement."

29. The cost-sharing agreement was entered into amongst Liberty Mutual, Black & Decker, and other insurance carriers with respect to the Mississippi Hearing Loss Claim.. The agreement was reduced to writing with the intent that all parties including Black & Decker would sign it. The original plan devised by Ms. McCroddan at ESIS was that each carrier and Black & Decker would in turn sign the cost-sharing agreement, and then forward it on to the next party "on the list." Apparently, the cost-sharing agreement got held up at the Home, and it is unclear whether all the parties ultimately signed the document.

30. Nevertheless, the parties had already previously agreed to the terms of the cost-sharing agreement, and the gathering of the parties' signatures was always just a formality. Black & Decker, and each of its carriers, were parties to the cost-sharing agreement, and Liberty Mutual made all of its payments with respect to the Mississippi Hearing Loss Claim pursuant to that agreement..

31. In a letter from Gordon Clifford, a Team Leader at ESIS, Black & Decker's claims handler, in a letter dated December 28, 1993, to representatives of the

carriers who were parties to the cost-sharing agreement with respect to the Mississippi Hearing Loss Claim, including me on behalf of Liberty Mutual, attached as Exhibit K, set forth certain revised percentages under the cost-sharing agreement with respect to the Home and Twin Cities insurance companies. In his letter, Mr. Clifford indicated that the invoices for Black & Decker's defense costs were being passed along to the carriers "pursuant to the cost-sharing agreement."

32. Pursuant to the cost-sharing agreement entered into by Black & Decker and its carriers with respect to the Mississippi Hearing Loss Claim, Liberty Mutual was only responsible for paying 37.5% of the total incurred defense costs. As is set forth in the text of the agreement itself, the parties intended to adopt a mechanism for allocating the responsibility for defense costs and indemnity payments, "by way of compromise and accord." The cost-sharing agreement further identified ESIS as the "manager" of the defense of the hearing loss claims against Black & Decker and that ESIS was operating "in the best interest of Black & Decker," these arrangements were also my specific understanding of the terms of the cost-sharing agreement from my conversations with representatives of Black & Decker and attorneys from their law firm, Miles & Stockbridge. Cost-Sharing Agreement at 6-7. Finally, the parties agreed that "[p]ayments for defense of Hearing Loss Claims made pursuant to this Agreement be final and will not be reallocated." Cost-Sharing Agreement at 7.

33. In late 1994 or early 1995, I contacted Richard Kidwell of Miles & Stockbridge, Black & Decker's counsel, to determine why we had not received any more bills for incurred defense costs, pursuant to the cost-sharing agreement. Mr. Kidwell informed me that if there were any more bills which needed to be paid, we would be so

informed; otherwise, Liberty Mutual's obligations pursuant to the cost-sharing agreement would be complete. Liberty Mutual never received any additional requests for payments of incurred defense costs from either ESIS or Black & Decker.

**Mississippi Hand/Arm Vibration Claim**

34. The Mississippi Hand/Arm Vibration Claim is similar to the Mississippi Hearing Loss Claim, in that the claims were made by present and former Ingalls Shipyard employees who worked at the same facility at issue in the Mississippi Hearing Loss Claim, utilizing the same tools used in the Ingalls Shipyard allegedly manufactured by Black & Decker amongst other companies. The claims were brought by the same attorneys representing the plaintiffs in the Mississippi Hearing Loss Claim. Black & Decker and the other insurers determined that because of the similarity of the claims, that they would be treated as a single mass litigation, despite the fact that, formally, these existed two separate suits.

35. John Sweeney of Miles & Stockbridge, and Black & Decker's risk management staff, attended joint defense meetings along with me and other carriers' representatives. With these same individuals, I discussed the issue that the cost-sharing agreement governing the payment of defense costs in Mississippi Hearing Loss Claim, should also apply here. They specifically concurred, as did the other carriers' representatives.

36. At the various joint meetings which I attended, the Mississippi Hearing Loss and Hand/Arm Vibration Claims were discussed interchangeably. In overlapping issues, the same defense experts were retained for both underlying actions, and in depositions, the underlying plaintiffs were questioned about injuries alleged in both suits.

Moreover, the invoices submitted to Liberty Mutual for payment pursuant to the cost-sharing agreement reflected the fact that counsel were billing their time and expenses for both suits together on the same invoices.

37. I recall also that there was a meeting at the Westin Hotel in New Orleans, where the tools from the underlying defendants, including Black & Decker's, were brought in and demonstrated. One of the demonstrations was related to the "noise levels" of the various tools, and another demonstration was related to how the tools "vibrated." The joint defense fund paid for the costs of this meeting, and Liberty Mutual paid for its assigned portion of joint defense costs pursuant to the cost-sharing agreement.

38. Liberty Mutual made payments toward the incurred defense costs for the Mississippi Hand/Arm Vibration Claim pursuant to the terms of the cost-sharing agreement in place with respect to the Mississippi Hearing Loss Claim. As such, Liberty Mutual was only responsible to pay 37.5% of those defense costs incurred by Black & Decker with respect to the Mississippi Hand/Arm Vibration Claim.

Signed under the pains and penalties of perjury on December 4, 1998.

_____
Alan Schlemmer