# EXHIBIT K

Page 1

```
 1              UNITED STATES DISTRICT COURT

 2              DISTRICT OF MASSACHUSETTS

 3   LIBERTY MUTUAL INSURANCE     :

 4   COMPANY,                     :

 5           Plaintiff            :

 6       vs.                      : CIVIL ACTION NO.:

 7   THE BLACK & DECKER           : 96-10804-DPW

 8   CORPORATION, BLACK & DECKER,:

 9   INC., BLACK & DECKER (U.S.),:

10   INC., EMHART CORPORATION and:

11   EMHART INDUSTRIES, INC.,     :

12           Defendants           :

13            --------------------

14           Deposition of RICHARD PATRICK KIDWELL,

15   taken on Tuesday, January 8, 2002 at 10:30 a.m.,

16   at the Law Offices of Miles & Stockbridge, P.C.,

17   10 Light Street, Baltimore, Maryland, before

18   Deborah C. D. Shumaker, Notary Public.

19            --------------------

20   Reported by:

21   Deborah C. D. Shumaker
```

EVANS REPORTING SERVICE

## Page 50

1    A.  I think it was pretty much always the
2  same, is that he insisted on having a policy and
3  claimed they couldn't find any, their documents.
4  We said well, we will certainly look to see what
5  we have, but even if we can't find the policy
6  itself, here are these other things that
7  letters, et cetera, that clearly demonstrate that
8  you covered Black & Decker, and that should be
9  good enough for you.
10    Q.  In paragraph 7 you indicate that you
11  would not have recommended that Black & Decker
12  enter into a cost-sharing agreement in that form
13  and referencing the cost-sharing agreement
14  described in Mr. Schlemmer's affidavit.
15    Do you see that?
16    A.  Yes.
17    Q.  Why would you not have recommended
18  Black & Decker enter into a cost-sharing
19  agreement in that form?
20    MR. PIROZZOLO:  Excuse me.  Where are
21  we in that reference?

## Page 51

1    MR. DUFFY:  Paragraph 7.
2    MR. PIROZZOLO:  Paragraph 7?  Thank you
3  very much.
4    A.  Because as stated in the middle of that
5  paragraph, the draft agreement that was attached
6  to Mr. Schlemmer's affidavit in one provision
7  said that the payment of the costs would be final
8  and not be reallocated, and that would have been
9  sticking Black & Decker with costs for which they
10  were not responsible.
11    Q.  Now, at the end of the paragraph you
12  basically indicate two options, that for a
13  cost-sharing agreement to be acceptable, it would
14  have had to either provide that Liberty Mutual
15  would pay a percentage reflecting the '64 to '79
16  period, --
17    A.  Right.
18    Q.  -- or, two, that Black & Decker would
19  be able to seek reallocation based on the period
20  covering '64 to 1970.
21    A.  Right.  If Black & Decker was going to

## Page 52

1  pay the '64 to '70 share, then they would have to
2  have the right to go back and try to recoup that
3  from Liberty Mutual.
4    Q.  Did you ever communicate your position
5  on this either/or arrangement to Mr. Schlemmer?
6    A.  Sure.
7    Q.  And when did you first do that?
8    A.  Oh, I can't tell you when it first came
9  up, but, again, in these telephone conversations
10  and the meeting in Philadelphia this came up.
11  Either you pay it, or if we pay it, we want to be
12  able to come back and get it from you.
13    MR. DUFFY:  I have here a letter.  It
14  is dated November 15th, 1991 that I will ask the
15  Reporter to mark as the exhibit next in order.
16    (Whereupon, Kidwell Deposition
17  Exhibit No. 3, 11/15/91 Letter to Carriers from
18  McCroddan, marked.)
19    BY MR. DUFFY:
20    Q.  I just ask that you take a moment to
21  review the exhibit.  Let me know when you've had

## Page 53

1  an opportunity.
2    A.  Okay.  I'm finished.
3    Q.  Did you receive a copy of this letter
4  in about November 15th, 1991?
5    A.  Yes.
6    Q.  Now, Ms. McCroddan indicates in the
7  middle of the second paragraph that "ESIS, a
8  CIGNA Company, has been providing claims services
9  to Black & Decker since October 1, 1986, and as
10  such, we will coordinate defense of this suit."
11    Do you see that?
12    A.  Yes.
13    Q.  Now, what were ESIS's responsibilities
14  in coordinating the defense of the suit?  What
15  were the elements of that?
16    A.  Well, I think she would be the person
17  who would talk to the other carriers, keep them
18  advised as to what was going on, make sure that
19  they rounded up, as she says in the next
20  sentence, their policies in the coverages, try to
21  determine their limits there were, what are the

## Page 54

1  terms and conditions, if any there were, that
2  would affect this, and try to be a focal point
3  for anything having to do with the coverages, et
4  cetera, of this case so that we didn't have five
5  or six different insurance carriers trying to
6  duplicate efforts and off and running and acting
7  at odds with either themselves or with Black &
8  Decker.
9    Q.  Now, were ESIS's responsibilities ever
10  specifically delineated for Liberty Mutual or any
11  of the other carriers that you know of?
12    A.  I'm not certain I understand your
13  question.
14    Q.  Did the role of ESIS ever come up in
15  any of the meetings or conversations you had with
16  Mr. Schlemmer?
17    A.  I don't recall that.
18    (Whereupon, Kidwell Deposition
19  Exhibit No. 4, 1/31/92 Cover Letter to Gentlemen
20  from McCroddan with Interim Cost-Sharing
21  Agreement for Mississippi Hearing Loss

## Page 55

1  Litigation, marked.)
2    BY MR. DUFFY:
3    Q.  I have just handed the Reporter another
4  document.  It's a letter dated January 31st,
5  1992, and the Reporter has marked it as the
6  exhibit next in order.
7    I just ask that, if you would, please,
8  take a look at the exhibit and let me know when
9  you've had a chance to look it over.
10    A.  Okay.
11    Q.  Did you receive this letter on or about
12  January 31, 1992?
13    A.  Yes.
14    Q.  Now, I note at the top of the second
15  page at the second and third line on that page,
16  it indicates "Rick Kidwell of Miles &
17  Stockbridge, Black & Decker's in-house counsel".
18    A.  Right.
19    Q.  Do you see that?
20    A.  I do see that.
21    Q.  Were you referred to as Black &

### Page 62

1 testimony earlier?
2    A.  I think that this was just something
3 that they ran up the flag pole to get the
4 discussion started and that Linda just put in
5 there an equal percentage for everybody, so did I
6 take issue with it?  I mean ultimately yeah, we
7 thought that Liberty Mutual ought to bear a
8 greater percentage because they had at least, as
9 I remember out of the time frame that we were
10 discussing and the way in which we were going to
11 try to work it, meaning take it by number of
12 years and assign a percentage on that basis,
13 then, yeah, ultimately these numbers had to
14 change.
15    Q.  Do you know why it is that the ESIS
16 company that represented Black & Decker inserted
17 the one-fifth allocations in the proposed
18 agreement?
19    A.  I don't know precisely why, as I say,
20 other than get the ball rolling and get the
21 discussions started.

### Page 63

1    Q.  Do you know why it is that Linda
2 McCroddan put in the one-fifth allocations
3 initially?
4    A.  I don't.
5       MR. DUFFY:  I have here a letter dated
6 August 5th, 1992 that I will ask the Reporter to
7 mark as the exhibit next in order.
8       (Whereupon, Kidwell Deposition
9 Exhibit No. 5, 8/5/92 Letter to Schlemmer to
10 McCroddan with attached Interim Cost-Sharing
11 Agreement, marked.)
12       MR. DUFFY:  Why don't we take a recess
13 now.
14       (Luncheon recess -- 11:58 a.m.)
15       (Afternoon session -- 12:20 p.m.)
16 BY MR. DUFFY:
17    Q.  If you would please review the document
18 that has just been marked as Exhibit Number 5.
19    A.  Okay.  I've looked at it.
20    Q.  Did you receive this document on or
21 about August 5th, 1992?

### Page 64

1    A.  Yes.
2    Q.  And this is a letter to Alan Schlemmer
3 on which you are cc'd, right?
4    A.  Correct.
5    Q.  Now, it states, quote, in the third
6 full sentence that, quote, "You will note Black &
7 Decker has agreed to consider itself self-insured
8 for the period of 1964 to 1970 since specific
9 coverage information has not been located to
10 date."
11       Do you see that?
12    A.  I do see that.
13    Q.  Is it correct that as of August 5th,
14 1992 specific coverage information had not been
15 located?
16    A.  I will take her at her word, yes, with
17 my understanding that specific coverage
18 information means the policies themselves and not
19 anything else.
20    Q.  With respect to the assertion that
21 Black & Decker has agreed to consider itself

### Page 65

1 insured for the period 1964 to 1970, did you have
2 any discussions with Ms. McCroddan regarding that
3 issue?
4    A.  Yes.
5    Q.  And when did you have those discussions
6 with Ms. McCroddan?
7    A.  I'm sure at the meeting back in
8 February and after that.  Whether it was before
9 that, I don't know.  Probably afterwards.
10    Q.  Did you ever contact Mr. Schlemmer
11 after your receipt of this August 5th, 1992
12 letter to indicate to him that Black & Decker had
13 not agreed to consider itself self-insured for
14 the period 1964 to 1970?
15    A.  Well, don't read too much into that
16 considering itself self-insured.  That was to get
17 the mechanism in place to pay the Mississippi
18 lawyers and who would be responsible for that,
19 but it didn't mean that forever and for all times
20 that Black & Decker had given up on convincing
21 Liberty Mutual that the '64 to '70 period was

### Page 66

1 there and Liberty Mutual's responsibility.
2       I am referring to my affidavit,
3 Exhibit 1, that has attached to it my letter of
4 August 6th, 1992 to Linda McCroddan in which I
5 state in the first paragraph that "We are still
6 negotiating with Liberty Mutual about the 1964,
7 1970 period.  That should not prevent us from
8 meeting and attempting to work out an
9 arrangement", so for the purposes of moving
10 forward to reach an ultimate decision, I again
11 will take Linda at her word that we were going to
12 do that for the time being but not to make it
13 final and unallocable, if that's a word.
14    Q.  But, Mr. Kidwell, I am going to refer
15 you to paragraph 9 of the attached proposed
16 agreement.
17       MR. PIROZZOLO:  Attached to here?
18    A.  Attached to Exhibit 5.
19    Q.  Which is attached to Exhibit 5.
20    A.  Right.
21    Q.  It indicates that such payments will

### Page 67

1 not be reallocated.  Do you see that?
2    A.  I see that in the middle of that
3 paragraph after the first couple of sentences it
4 talks about everybody reserving all the rights
5 they have and the agreement not creating any
6 rights or obligations, that the payments will be
7 final and will not be reallocated and then the
8 next sentence going on to saying that even though
9 they won't be reallocated, payment doesn't
10 constitute an admission or evidence of any
11 nature, so that whole paragraph is ambiguous,
12 contradictory.
13       You know, it basically doesn't make
14 sense the way it's written.
15    Q.  Well, couldn't it make sense if interim
16 payments are not -- strike that.
17       Referring you to your letter dated
18 August 6th, 1992 to Ms. McCroddan, you did not
19 copy Liberty Mutual on this letter, correct?
20    A.  That's correct.
21    Q.  And why is that?

EVANS REPORTING SERVICE

Page 68

1    A.  Because this was just telling Linda
2  that I had gotten her letter and the proposed
3  agreement but for her to know that it was not
4  fully agreed upon, that we were still fighting
5  with Liberty Mutual about that '64 to '70 time
6  frame and then also, of course, to talk about the
7  proposed meeting that she had and then a
8  follow-up and finish-up by talking about the
9  problems with the London carriers.
10    Q.  Now, did you ever indicate to Liberty
11  Mutual at any point after this August 5th, 1992
12  date that the issue of allocation had not yet
13  been fully agreed upon?
14    A.  Yes.  It was -- a running battle is too
15  strong a word, but this was the continuous back
16  and forth between Liberty Mutual and I will say
17  us, including me and the Black & Decker folks, is
18  that you guys, you Liberty Mutual, should be
19  covering this time period.
20    Q.  Did that back and forth continue after
21  the date August 5th, 1992?

Page 69

1    A.  I think it did.
2    Q.  And what is the basis for your
3  assertion that you think it did?
4    A.  My recollection is that those
5  discussions were ongoing even after this proposed
6  arrangement that Black & Decker wasn't going to
7  quit on either you pay for it up front, Liberty
8  Mutual, or if we pay for it, we want to come back
9  and get it from you because we know that you
10  covered us back then.
11    Q.  Can you tell me any specific
12  conversation that happened after August 5th, 1992
13  in which it was an indication that this issue was
14  still open?
15    A.  I can't give you specific date, time,
16  conversation.
17    Q.  Have you seen any correspondence that
18  indicates that this issue continued after August
19  5th, '92?
20    A.  I'm looking at Exhibit 2, and I don't know if
21  Mr. Schlemmer's affidavit, and I don't know if

Page 70

1  there was something in there or if it was in his
2  deposition where he made mention of discussions
3  in New Orleans about the allocation issue, so I
4  don't know if those discussions were after August
5  of '92, but it was, in my mind, again more
6  evidence that this was this back and forthing
7  between Black & Decker and Liberty Mutual.
8    Q.  Just so I'm clear, though, because I
9  thought I heard you say, you don't know if these
10  discussions happened after August '92; is that
11  correct?
12    A.  In New Orleans to which he had
13  referred, and it was either in his affidavit or
14  his deposition, he had mentioned that there had
15  been discussions in New Orleans in addition to
16  that meeting in Philadelphia and telephone
17  conversations about the allocation
18  responsibility.
19    Q.  But your New Orleans meetings happened
20  as early as 1991 and happened during the course
21  of '92, correct?

Page 71

1    A.  I believe that to be correct.
2    Q.  So those conversations could well have
3  happened before the August 5th, 1992 date of
4  Ms. McCroddan's letter to Mr. Schlemmer?
5    A.  Of Exhibit 5?
6    Q.  Correct.
7    A.  They could have?  Sure, they could
8  have, and they could have been afterwards.
9    Q.  But sitting here today, you don't know
10  one way or the other?
11    A.  I don't know the specific date and
12  time, the specific meeting in New Orleans where
13  these things were discussed, and I can't find, as
14  I sit here, a reference in his affidavit, and I
15  don't remember from his deposition, but I do
16  remember from either the affidavit or the
17  deposition his making reference to discussions in
18  New Orleans about it.
19    Q.  Do you recall those discussions in New
20  Orleans?
21    A.  Again, not the specific date, time and

Page 72

1  all of that but as part of the overall theme of
2  this ongoing discussion with Liberty Mutual.
3    Q.  Can you recall anything specific that
4  was said by either Mr. Schlemmer or yourself at
5  these New Orleans discussions?
6    A.  I probably wondered why he was being so
7  hard-headed and insisting upon a policy that his
8  company had failed to keep or have any records of
9  and wouldn't accept, what I was convinced and was
10  in my mind clear and convincing, the evidence
11  that they covered Black & Decker from '64 to
12  '70.
13    Q.  During the period of time that you were
14  responsible for the Mississippi hearing loss
15  litigation, did Liberty Mutual make any payment
16  of defense costs during that period of time?
17    A.  I don't remember.
18    Q.  Did you ever have any discussions with
19  respect to whether Liberty Mutual would be
20  responsible for paying Miles & Stockbridge's
21  defense costs in connection with the Mississippi

Page 73

1  hearing loss litigation?
2    A.  We weren't -- my appearance wasn't
3  entered nor was any Miles & Stockbridge
4  appearance entered in the Mississippi cases that
5  I can remember, so there weren't any direct,
6  quote, unquote, costs for the Mississippi defense
7  from Miles & Stockbridge.  Our services were
8  being rendered to Black & Decker who was paying
9  our bills, so I don't remember any discussion
10  about the carriers having to compensate us,
11  meaning Miles & Stockbridge, or reimburse Black &
12  Decker for bills paid to Miles & Stockbridge.
13    MR. DUFFY:  I have another exhibit that
14  I will ask the Reporter to mark as the exhibit
15  next in order.  It's a June 18th, 1993 letter
16  from Linda McCroddan to Alan Schlemmer, among
17  others.
18    (Whereupon, Kidwell Deposition
19  Exhibit No. 6, 6/18/93 to Carriers from
20  McCroddan, marked.)
21    BY MR. DUFFY:

### Page 86

1 fact call Miles & Stockbridge other than the fact
2 that you weren't here at the time?
3     MR. PIROZZOLO: Objection.
4     A. I don't know whether he called Miles &
5 Stockbridge, but his statement is I contacted
6 Richard Kidwell of Miles & Stockbridge and I know
7 for a fact that it did happen, so whether he
8 called and did whatever, I have no idea.
9     Q. Did Mr. Schlemmer have your telephone
10 number, though? Had he called you in the past?
11     A. He must have. He must have had my
12 number, and I know we talked to each other in the
13 past. Again, whether I called him or he called
14 me, I don't remember.
15     Q. And had you been his principal contact
16 at Miles & Stockbridge for this matter?
17     A. At Miles & Stockbridge, yes.
18     Q. And at the time when you left Miles &
19 Stockbridge and you shortly before that shifted
20 the case over to Mr. Sweeney, did you make any
21 efforts to inform carriers, et cetera, of your

### Page 87

1 departure?
2     A. I remember John accompanying me to a
3 New Orleans meeting and making introductions at
4 the New Orleans meeting as to who he is and what
5 his role would be with carriers and other
6 defendants and counsel and all that. I can't
7 tell you when that meeting was. It had to have
8 been sometime in 1993, so that's how I would have
9 let people know that, hey, John is going to be
10 doing this, running this, he's the one you will
11 need, he'll be needing to talk to going forward.
12     Q. Now, your number at the Towson office
13 of Miles & Stockbridge at the time, actually you
14 did have a direct dial, I see?
15     A. Right.
16     Q. Do you know what happened if you called
17 that direct dial after you had left?
18     A. No.
19     MR. DUFFY: I have nothing further.
20 Jack?
21     MR. PIROZZOLO: I've got a couple of

### Page 88

1 questions.
2     MR. DUFFY: Sure.
3     EXAMINATION BY MR. PIROZZOLO:
4     Q. Mr. Kidwell, can I ask you to look at
5 the Schlemmer affidavit.
6     A. My Deposition Exhibit Number 2?
7     Q. Yes. Can I ask you to turn to
8 paragraph 30.
9     A. Paragraph 30? Yes.
10     Q. Mr. Duffy asked you a question earlier
11 in the deposition as to whether there were items
12 in Mr. Schlemmer's affidavit with which you
13 disagreed.
14     A. I remember that.
15     Q. I am inviting your attention to
16 paragraph 30. Could you tell us whether that
17 contains statements with which you agree or
18 disagree.
19     A. That first sentence where it said the
20 parties had agreed to the terms of the
21 cost-sharing agreement and the gathering of

### Page 89

1 signatures was always just a formality, that's
2 not my recollection, that there were these
3 ongoing discussions about specifically the '64 to
4 '70 period and that if Liberty Mutual wasn't
5 going to pay it, then Black & Decker wanted to
6 have a way to get the money back that it would
7 have to be paying on Liberty Mutual's behalf, so
8 I would say, I have said, I will say that I
9 disagree with that.
10     Q. Can I invite your attention to
11 paragraph 27. It's right above the same page.
12     A. Yes.
13     Q. Do you notice that Mr. Schlemmer refers
14 to the date of November 3, 1992 --
15     A. Yes.
16     Q. -- executing something?
17     A. I do see that.
18     Q. Does that help you remember in the
19 light of other correspondence that you have had
20 before you in the deposition about when you
21 talked with Mr. Schlemmer in New Orleans?

### Page 90

1     A. That paragraph alone doesn't do it.
2     Q. Is there anything else that --
3     A. I think maybe there was something in
4 his deposition where he made reference to when
5 the discussions were, but without the deposition
6 or thumbing through it, I can't be more specific,
7 and this November date of '92, I'm sorry.
8     Q. He uses the phrase "memorialization of
9 the cost-sharing agreement" as a phrase.
10     A. I do see that.
11     Q. You are an attorney, a lawyer?
12     A. Yes.
13     Q. So you understand the meaning of
14 memorialization of the cost-sharing agreement?
15     A. Yes.
16     MR. DUFFY: Objection.
17     A. Sorry. Yes.
18     Q. Do you agree or disagree with the
19 statement that whatever was attached as Exhibit I
20 was a memorialization of a cost-sharing
21 agreement?

### Page 91

1     MR. DUFFY: Objection to form. You can
2 answer.
3     A. Yes. I disagree that it was -- there
4 were bits and pieces of an overall agreement that
5 had been agreed upon, so there were certain terms
6 that people were agreeable to, but not an
7 overall, all-encompassing cost-sharing agreement.
8     Q. As of November 3rd had an oral
9 cost-sharing agreement been entered into as to
10 which there could be a written memorialization?
11     A. Again, not an overall, all-encompassing
12 cost-sharing agreement.
13     Q. And would it be correct that the main
14 issue was that which arises out of the language
15 of paragraph --
16     MR. DUFFY: I think you are looking at
17 paragraph 9, Jack.
18     MR. PIROZZOLO: Yeah.
19     Q. Paragraph 9.
20     MR. DUFFY: But I will object to the
21 form.

## Page 92

1 MR. PIROZZOLO: Let me finish the
2 question. Thank you for the help.
3 Q. I know it is paragraph 9, but I want to
4 get the reference. It's attached to Exhibit 5.
5 A. Yes.
6 Q. Is it correct that the main point of
7 disagreement was the disagreement regarding the
8 document that is attached as Exhibit 5 was the
9 language of paragraph 9?
10 MR. DUFFY: Same objection.
11 A. The answer is yes.
12 Q. What was there about the language of
13 paragraph 9 that was the point or a point of
14 disagreement?
15 A. Well, as I pointed out in the previous
16 answer, the language is ambiguous, contradictory,
17 but it doesn't set forth what was the whole issue
18 between Black & Decker and Liberty Mutual here,
19 and that is either Liberty Mutual agrees to pay
20 for the '64 to '70 time period or if they will
21 not agree to it, that Black & Decker, while

## Page 93

1 bearing those expenses initially, will have a
2 mechanism to try to recoup those payments from
3 Liberty Mutual, I believe.
4 Q. Earlier in your testimony you described
5 paragraph 9 as, I don't know if they were your
6 exact words, but having some inherent
7 contradiction.
8 A. Yes.
9 Q. Could you explain what you mean by
10 that.
11 MR. DUFFY: Objection to the form, but
12 you can answer.
13 A. The beginning of that paragraph 9
14 purports to let anybody reserve any rights that
15 it has or they have and that it is not creating
16 any rights or obligations on anybody. Then it
17 seems to take all of that away by saying that any
18 payments made are final and will not be
19 reallocated.
20 Then it goes on to take away from that
21 by saying that even though we are not going to

## Page 94

1 reallocate the payments, that doesn't serve as
2 any evidence or admission that anybody owes
3 anything to anybody else, so you go from one end
4 to the other and back again.
5 Q. Did you ever recommend that Black &
6 Decker execute the cost-sharing agreement
7 attached to Exhibit 5?
8 A. No.
9 MR. PIROZZOLO: I have no other
10 questions. Are we done?
11 MR. DUFFY: Yes.
12 MR. PIROZZOLO: You should read it.
13 (Examination concluded -- 1:00 p.m.)
14 _____
15
16
17
18
19
20
21

## Page 95

1 INDEX OF EXAMINATION
2 BY MR. DUFFY................................ 3
3 BY MR. PIROZZOLO........................... 88
4
5 INDEX OF EXHIBITS
6 No. 1, Affidavit of Richard P. Kidwell......... 4
7 No. 2, Affidavit of Alan Schlemmer............ 25
8 No. 3, 11/15/91 Letter to Carriers from
9 McCroddan...................................... 52
10 No. 4, 1/31/92 Cover Letter to Gentlemen
11 from McCroddan with Interim Cost-Sharing
12 Agreement for Mississippi Hearing Loss
13 Litigation.................................... 54
14 No. 5, 8/5/92 Letter to Schlemmer to
15 McCroddan with attached Interim
16 Cost-Sharing Agreement...................... 63
17 No. 6, 6/18/93 to Carriers from McCroddan..... 73
18 No. 7, 12/28/93 Letter........................ 77
19
20
21

## Page 96

1 CERTIFICATE OF DEPONENT
2
3 I hereby certify that I have read and
4 examined the foregoing transcript, and the same
5 is a true and accurate record of the testimony
6 given by me.
7
8 Any additions of corrections that I feel are
9 necessary, I will attach on a separate sheet of
10 paper to the original transcript.
11
12 _____
13 RICHARD PATRICK KIDWELL
14
15
16
17
18
19
20
21

## Page 97

1 STATE OF MARYLAND  SS:
2 I, DEBORAH C. D. SHUMAKER, a Notary Public
3 of the State of Maryland, do hereby certify that
4 the within named, personally appeared before me
5 at the time and place herein set out, and after
6 having been duly sworn by me, was interrogated by
7 counsel.
8 I further certify that the examination was
9 recorded stenographically by me and this
10 transcript is a true record of the proceedings.
11 I further certify that the stipulations
12 contained herein were entered into by counsel in
13 my presence.
14 I further certify that I am not of counsel
15 to any of the parties, nor an employee of
16 counsel, nor related to any of the parties, nor in
17 any way interested in the outcome of this action.
18 As witness my hand and notarial seal this
19 ^ day of ^MONTH, 2002.
20 My commission expires
21 July 1, 2002      Notary Public